**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| CAMELLIA REZAYAT, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>FRONTLINE TECHNOLOGIES GROUP LLC D/B/A FRONTLINE EDUCATION,<br><br>Defendant. | Case No.:<br><br>**COMPLAINT— CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Camellia Rezayat ("Plaintiff"), on behalf of herself, and all others similarly situated, by and through her undersigned counsel, brings this Class Action Complaint against Frontline Technologies Group LLC d/b/a Frontline Education ("Frontline" or "Defendant"). Plaintiff alleges the following upon information and belief based on the investigation of counsel, except as to those allegations that specifically pertain to Plaintiff, which are alleged upon personal knowledge.

## INTRODUCTION

1. Plaintiff and the proposed Class Members bring this class action lawsuit on behalf of all persons who had their Personally Identifiable Information ("PII")[1] ("Private Information") accessed and stolen when an unauthorized third party infiltrated a portion of Frontline's computer environment on or about August 14, 2026 and then exfiltrated Plaintiff's and Class Members' PII (the "Data Breach" or the "Breach").

[1] Personally identifiable information generally incorporates information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information. 2 C.F.R. § 200.1. At a minimum, it includes all information that on its face expressly identifies an individual.

2. Specifically, Plaintiff's claims arise from Defendant's failure to properly secure and safeguard Private Information that was entrusted to it and its accompanying responsibility to store and transfer that information.

3. Defendant is a Pennsylvania-based provider of cloud-based software and administrative technology for K-12 schools and school districts. Frontline markets its platform as an all-in-one suite that connects the systems districts use to run their operations, including human capital management (recruiting, hiring, onboarding, payroll, absence tracking, and professional development), student management (special education programs, school health records, and student information systems), and business operations (enterprise resource planning, finance, and analytics). In providing these services, Frontline collects, stores, and maintains vast amounts of sensitive personally identifiable information belonging to school district employees, job applicants, and students.

4. Defendant had numerous statutory, regulatory, contractual, and common law duties and obligations, including those based on affirmative representations to Plaintiff and Class Members, to keep Plaintiff's and Class Members' Private Information confidential, safe, secure, and protected from unauthorized disclosure or access.

5. On or about August 14, 2026, Frontline detected that an unauthorized third party had exploited a vulnerability in software supplied by another vendor and used it to infiltrate a portion of Frontline's computer environment. Files containing the sensitive personal information of Plaintiff, along with that of other current and former employees of Frontline's school district and education-sector customers, were compromised as a result.

6. Defendant failed to take basic precautions designed to keep individuals' Private Information secure. Defendant could have prevented or mitigated the consequences of the Data Breach by limiting access to the Private Information stored on its network to only necessary employees, requiring multi-factor authentication to verify access credentials, encrypting data at rest and in transit, monitoring its systems for signs of unusual activity or the transfer of large volumes of data, and regularly changing passwords. These are all basic and industry-standard data security measures.

7. Defendant owed Plaintiff and Class Members a duty to take all reasonable and necessary measures to keep the Private Information it collected safe and secure from unauthorized access. Defendant solicited, collected, used, and derived a benefit from the Private Information, yet breached its duty by failing to implement or maintain adequate security practices.

8. The Private Information compromised in the Data Breach was highly sensitive, representing a gold mine for data thieves. The data included, but is not limited to, Social Security numbers, home addresses, and email addresses that Defendant collected and maintained on behalf of Plaintiff and Class Members.

9. Armed with the Private Information accessed in the Data Breach (and a head start), data thieves can commit a variety of crimes including, *e.g.*, opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' names and health plan information to obtain medical services, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, and giving false information to police during an arrest.

10. Therefore, Plaintiff and Class Members have already suffered—and are at an imminent, immediate, and continuing increased risk of suffering—ascertainable losses in the form

of harm from identity theft and other fraudulent misuse of their Private Information, the loss of the benefit of their bargain, out-of-pocket expenses incurred to remedy or mitigate the effects of the Data Breach, and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach.

11. Plaintiff brings this class action lawsuit to address Defendant's inadequate safeguarding of Class Members' Private Information that it collected and maintained, and its failure to provide timely and adequate notice to affected individuals, including Plaintiff and Class Members, of the Breach and the types of information unlawfully accessed.

12. The potential for improper disclosure and theft of Plaintiff's and Class Members' Private Information was a known risk to Defendant, and thus Defendant was on notice that failing to take necessary steps to secure Private Information left it vulnerable to an attack.

13. Defendant failed to properly monitor and implement security practices with regard to the computer network and systems that housed Private Information. Had Defendant properly monitored its IT Network, it would have discovered the Breach sooner.

14. Plaintiff's and Class Members' identities are now at risk because of Defendant's negligent conduct as the Private Information that Defendant collected and maintained is now in the hands of data thieves and other unauthorized third parties.

15. Plaintiff seeks to remedy these harms on behalf of herself and all similarly situated individuals whose Private Information was accessed and/or compromised during the Data Breach.

16. Accordingly, Plaintiff, on behalf of herself and the Class, asserts claims for negligence, breach of third-party beneficiary contract, unjust enrichment, breach of implied contract, and violation of the California Consumer Privacy Act (Cal. Civ. Code § 1798.150).

## PARTIES

***Plaintiff***

17. Plaintiff Camellia Rezayat is an adult individual who at all relevant times has been a citizen and resident of California. Plaintiff is a current employee of the Glendale Unified School District ("GUSD"), which uses Frontline's software to administer its workforce and, through that use, transmitted Plaintiff's Private Information to Frontline.

***Defendant***

18. Defendant is a Delaware limited liability company that maintains its principal place of business at 550 E. Swedesford Road, Suite 360, Wayne, Pennsylvania.

## JURISDICTION AND VENUE

19. This Court has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of Class Members is more than 100, and at least one member of the Class defined below is a citizen of a different state from Defendant's citizenship, including Plaintiff Camellia Rezayat. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

20. The Court has personal jurisdiction over Defendant because Defendant maintains its headquarters and principal place of business in the Commonwealth of Pennsylvania and thereby conducts substantial business within this Commonwealth and within this District.

21. Venue is proper in this Court because Defendant's headquarters is located in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

### A. Background on Defendant and the Sensitive Employee Data It Holds.

22. Defendant is a Pennsylvania-based company that sells administrative software designed specifically for K-12 schools. School districts and other education organizations rely on that software to run a range of operations, including the management of their workforces. In the course of delivering its services, Frontline receives and stores the Private Information of its customers' employees within its own computer environment.

23. Plaintiff and the other Class Members are current and former employees of school districts and education organizations that use Frontline's software. Their employers required them to provide highly sensitive and valuable Private Information as a condition of employment, and those employers then passed that information along to Frontline. Frontline took in, stored, and maintained that information while performing services for those employers.

24. When Plaintiff and Class Members gave their Private Information to their employers, they reasonably expected that it would be kept secure and disclosed only as authorized. That expectation extended to any vendor, including Frontline, entrusted with the information on their employers' behalf.

25. Frontline knowingly took possession of Plaintiff's and Class Members' Private Information and profited from using it. In doing so, Frontline assumed legal and equitable duties to protect that information, and it knew or should have known that it was responsible for keeping the information safe from unauthorized access, disclosure, and theft. Those duties include the obligation, under California law, of any business that maintains personal information about a California resident to implement and maintain reasonable security procedures and practices appropriate to the nature of that information. Cal. Civ. Code § 1798.81.5(b).

**B. The Frontline Data Breach.**

26. In or around mid-August 2026, an unauthorized actor exploited a vulnerability in a third-party software product that Frontline uses and, through it, gained access to part of Frontline's computer environment. Frontline identified the vulnerability on or about August 14, 2026. Frontline has not disclosed when the unauthorized access began or how long it went undetected.

27. GUSD has since confirmed the incident to its employees. In an email to staff, including Plaintiff, dated October 6, 2026 (the "Notice"), GUSD's Assistant Superintendent of Business Services explained that GUSD uses Frontline as a third-party service provider for its personnel records, that Frontline's data security was "compromised on August 14, 2026," and that the intrusion was "halted by August 15, 2026."

28. The Notice reports that the incident "impacted personnel data across multiple school districts nationwide," affecting both current and former employees and applicants, and that the accessed data "may have included Social Security numbers, home addresses, and email addresses." Upon information and belief, the compromised files also contained the names associated with that information.

29. The incident did not become public until October 2, 2026, roughly seven weeks after Frontline identified the vulnerability, when the technology news outlet BleepingComputer reported that Frontline had notified a school district that the Private Information of 1,210 of its employees was compromised.[2]

---

[2] *See* Lawrence Abrams, *Frontline Education Breach Exposes School District Employee Data,* BLEEPINGCOMPUTER (Oct. 2, 2026), https://www.bleepingcomputer.com/news/security/frontline-education-data-breach-impacts-school-district-employees/.

30. Frontline has told its district customers that it will notify affected individuals directly and offer them two years of credit monitoring and identity theft protection through TransUnion. According to the Notice, those individual notices will not begin going out until "on or about October 17, 2026," more than nine weeks after Frontline identified the vulnerability. Frontline has not publicly stated how many districts or individuals were affected. Every day without notice costs those individuals the chance to freeze their credit, place fraud alerts, and monitor their accounts before their information is misused.

31. Plaintiff received the Notice on or about October 6, 2026. Upon information and belief, because GUSD uses Frontline for its personnel records, and because Plaintiff is an employee of GUSD who received the Notice, Plaintiff's Private Information was among the data compromised in the Data Breach.

32. Upon information and belief, the Data Breach resulted in an unauthorized third party accessing and/or acquiring files containing unencrypted Private Information of Plaintiff and Class Members.

33. This was a targeted attack. The intruder deliberately exploited a software vulnerability to reach a repository of employee data, which indicates that Frontline was chosen because of the sensitive information it holds. That information, including Social Security numbers and the names and addresses that accompany them, is exactly what identity thieves want, and unlike a credit card number, a Social Security number cannot readily be changed. Armed with the Private Information accessed in the Data Breach (and a head start), data thieves can commit a variety of crimes, including opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' information to obtain government benefits, filing fraudulent tax returns, and giving false information to police during an arrest.

34. Frontline failed to take precautions designed to keep individuals' Private Information secure. It did not use reasonable security procedures and practices appropriate to the nature of the sensitive information it was maintaining for Plaintiff and Class Members, such as encrypting the information or deleting it when it was no longer needed. That failure is especially troubling here, where the compromised data includes information belonging to former employees and job applicants.

35. Frontline could also have prevented or mitigated the consequences of the Data Breach by promptly identifying and patching the vulnerability in its third-party software, conducting penetration tests and third-party audits, limiting access to Private Information to only necessary employees, requiring multi-factor authentication, encrypting data at rest and in transit, monitoring its systems for unusual activity or the transfer of large volumes of data, and regularly changing passwords. These are all basic and industry-standard data security measures.

36. Despite being a technologically sophisticated company with substantial resources, Frontline failed to adequately train its personnel in handling sensitive information. It also failed to timely identify and remediate the vulnerability the attacker exploited, including by applying available updates and patches, and it otherwise fell short of the data security practices that industry standards and best practices require.

37. As a result of Frontline's deficient security and its delay in notifying affected individuals, Plaintiff and Class Members now face a present, substantial, and imminent risk of fraud and identity theft that will follow them for years. Upon information and belief, the Private Information of Plaintiff and Class Members is likely to be, or has been, sold and disseminated on illicit criminal networks, including the dark web, as that is the modus operandi of cybercriminals

who carry out attacks of this kind. Plaintiff and Class Members are, and will remain, at risk that their data will be sold or listed on the dark web and, ultimately, illegally used.

### C. Frontline Acquires, Collects, and Stores Plaintiff's and Class Members' Private Information Through Their Employers.

38. As a condition of applying for and obtaining employment with the school districts and other education organizations that use Frontline's software, Plaintiff and Class Members were required to provide their sensitive and confidential Private Information to those employers, which in turn provided it to Frontline.

39. Defendant retains and stores this information and derives a substantial economic benefit from the Private Information that it collects. But for the collection of Plaintiff's and Class Members' Private Information, Frontline would be unable to perform its services, which largely revolve around collecting, storing, and managing school employees' personnel records, including hiring, onboarding, and payroll data.

40. At all relevant times, Frontline knew it was storing sensitive Private Information, including Social Security numbers, for school districts across the country, and that, as a result, its systems would be an attractive target for cybercriminals.

41. Defendant also knew that a breach of its systems, and exposure of the information stored therein, would result in an increased risk of identity theft and fraud against the individuals whose Private Information was compromised.

42. Frontline could have prevented this Data Breach by properly securing and encrypting the files and file servers containing the Private Information of Plaintiff and Class Members, and by promptly identifying and remediating the vulnerability in its third-party software that the unauthorized actor exploited.

43. Frontline's negligence in safeguarding the Private Information of Plaintiff and Class Members is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data, including recent, widely reported breaches at other K-12 education technology providers.

**D. Defendant Knew or Should Have Known of the Risk of a Cyberattack Because Entities in Possession of Private Information Are Particularly Susceptible.**

44. Data thieves regularly target entities like Frontline due to the highly sensitive information that they maintain. Frontline knew and understood that unprotected Private Information is valuable and highly sought after by criminals who seek to illegally monetize that Private Information through unauthorized access.

45. Frontline also understood its own obligations. By its own account, Frontline "receives information provided by districts related to teachers and other school employees," including their names, addresses, email addresses, dates of birth, and Social Security numbers.[3] In its Privacy Policy, Frontline represents that it "maintains strict administrative, technical and physical procedures to protect information stored in our servers"; that it stores and processes data "in accordance with industry best practices," including "appropriate administrative, physical, and technical safeguards to secure data from unauthorized access, disclosure, and use"; and that it "will conduct periodic risk assessments and remediate any identified security vulnerabilities in a timely manner."[4]

46. Frontline further represents that it has "a written incident response plan, to include prompt notification of the districts and educators in the event of a security or privacy breach of

---

[3] *See Privacy Policy*, FRONTLINE EDUCATION, https://www.frontlineeducation.com/pages/privacy-policy/ (last visited Oct. 12, 2026).

[4] *Id.*

protected information."[5] Plaintiff's and Class Members' Private Information was provided to Frontline, through their employers, with the reasonable expectation that Frontline would honor these commitments.

47. Frontline's data security obligations were particularly important given the substantial increase in cyberattacks and data breaches targeting entities like Frontline that collect and store Private Information, including in the K-12 education technology industry in which Frontline operates. Frontline was aware of the risk of data breaches because such breaches have dominated the headlines in recent years.

48. In light of recent, high-profile data breaches at other K-12 education technology providers, Frontline knew or should have known that the Private Information it collected and maintained would be targeted by cybercriminals.

49. In January 2025, PowerSchool, a provider of K-12 education software, disclosed a data breach, first detected on December 28, 2024, that exposed the names, contact information, and Social Security numbers of students and educators from school districts across the country.[6] In May 2026, Instructure, Inc., the provider of the Canvas learning management system used by schools across the country, confirmed a data breach that the ShinyHunters extortion group claimed affected nearly 9,000 schools.[7] And in June 2026, Infinite Campus, a student information system used by more than 3,200 school districts, was reported to have suffered a breach that compromised

---

[5] *Id.*

[6] Amar Ćemanović, *PowerSchool Notifies Students and Educators of Major Data Breach*, CYBERINSIDER (Jan. 28, 2025), https://cyberinsider.com/powerschool-notifies-students-and-educators-of-major-data-breach/.

[7] Lawrence Abrams, *Instructure Confirms Data Breach, ShinyHunters Claims Attack*, BLEEPINGCOMPUTER (May 3, 2026), https://www.bleepingcomputer.com/news/security/instructure-confirms-data-breach-shinyhunters-claims-attack/.

information associated with more than 137,000 school staff accounts.[8] That most recent report came only two months before Frontline identified the vulnerability at issue here.

50. The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities in the U.S. In 2025, the Identity Theft Resource Center tracked a record 3,322 data compromises in the United States, up from 3,152 in 2024, including 188 in the education sector.[9]

51. Despite the prevalence of public announcements of data breaches and data security compromises, Defendant failed to take appropriate steps to protect the Private Information of Plaintiff and Class Members from being compromised.

52. The increase in such attacks, and the attendant risk of future attacks, was widely known to the public and to anyone in Frontline's industry, including Frontline itself.

53. Private Information like that targeted in the Data Breach is of great value to hackers and cybercriminals, and it can be used in a variety of unlawful ways. It can be used to distinguish, identify, or trace an individual's identity, whether alone or in combination with other personal or identifying information linked to that individual.

54. Given the nature of the Data Breach, it was foreseeable that the compromised Private Information would be used by hackers and cybercriminals in a variety of harmful ways. Cybercriminals who possess Plaintiff's and Class Members' Private Information can, either alone

---

[8] Sergiu Gatlan, *Infinite Campus Data Breach Affects 137,000 School Staff Accounts*, BLEEPINGCOMPUTER (June 15, 2026), https://www.bleepingcomputer.com/news/security/infinite-campus-data-breach-affects-137-000-school-staff-accounts/.

[9] IDENTITY THEFT RESOURCE CENTER, 2025 Annual Data Breach Report (press release), https://www.idtheftcenter.org/post/2025-annual-data-breach-report/ (last visited Oct. 12, 2026).

or in tandem with other information, obtain their tax returns or open fraudulent credit cards and other accounts in their names.

55. As a business in possession of individuals' Private Information, Frontline knew, or should have known, the importance of safeguarding the Private Information entrusted to it by Plaintiff and Class Members and of the foreseeable consequences if its data security systems were breached. Such consequences include the significant costs imposed on Plaintiff and Class Members due to a breach. Nevertheless, Defendant failed to take adequate cybersecurity measures to prevent the Data Breach.

56. Frontline was, or should have been, fully aware of the unique type and significant volume of data on its servers, including the Social Security numbers of school employees across the country, and thus the significant number of individuals (upon information and belief, likely hundreds of thousands) who would be harmed by the exposure of that data.

57. The Data Breach was therefore foreseeable. Defendant was cognizant of the risk of data breaches given how common and high-profile they have become for businesses that have custody of Private Information, and the injuries to Plaintiff and Class Members were directly and proximately caused by Frontline's failure to implement or maintain adequate data security measures for their Private Information.

58. The ramifications of Frontline's failure to keep secure the Private Information of Plaintiff and Class Members are long-lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years.

**E. Defendant Fails to Comply with FTC Guidelines and Industry Standards.**

59. The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

60. In 2016, the FTC updated its publication, *Protecting Personal Information*: *A Guide for Business*, which established cybersecurity guidelines for businesses. These guidelines note that businesses should protect the personal information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[10]

61. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[11]

62. The FTC's guidance specifically addresses the type of failure alleged here. It advises businesses that use third-party software to apply updates and patches as they are issued, to maintain reasonable patch management policies and procedures, and to move quickly to fix vulnerabilities once they are identified.[12] It also advises businesses not to take their service providers' word on security but to verify that reasonable measures are in place. Upon information and belief, Frontline failed to do so.

63. The FTC further recommends that companies not maintain Private Information longer than is needed for the purpose for which it was collected; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security;

---

[10] FED. TRADE COMM'N, *Protecting Personal Information: A Guide for Business* (2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

[11] *Id.*

[12] FED. TRADE COMM'N, *Start with Security: A Guide for Business* (rev. Aug. 2023), https://www.ftc.gov/business-guidance/resources/start-security-guide-business.

monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

64. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

65. These FTC enforcement actions include actions against entities that fail to adequately protect individuals' data, like Defendant. *See, e.g.*, *In the Matter of LabMD, Inc., a Corp.*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act."), *vacated on other grounds by LabMD, Inc. v. Fed. Trade Comm'n*, 894 F.3d 1221 (11th Cir. 2018).

66. Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect Private Information. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

67. Defendant failed to properly implement some or all of these (and other) basic data security practices.

68. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to individuals' Private Information or to comply with applicable

industry standards constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

69. Upon information and belief, Defendant was at all times fully aware of its obligation to protect the Private Information of Plaintiff and Class Members; Defendant was also aware of the significant repercussions that would result from its failure to do so. Accordingly, Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

70. As noted above, experts studying cybersecurity routinely identify entities in possession of PII as being particularly vulnerable to cyberattacks because of the value of the Private Information that they collect and maintain.

71. Experts have identified several best practices that at a minimum should be implemented by entities in possession of PII, like Defendant, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and limiting which employees can access sensitive data. Upon information and belief, Defendant failed to follow these industry best practices.

72. Other best cybersecurity practices that are standard for entities in possession of Private Information include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protecting against any possible communication system; and training staff

regarding critical points. Upon information and belief, Defendant failed to follow these cybersecurity best practices, including failing to train staff.

73. Upon information and belief, Defendant also failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR.DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04).

74. These frameworks are existing and applicable industry standards for a business's obligations to provide adequate data security for individuals' sensitive information. Upon information and belief, Defendant failed to comply with at least one – or all – of these accepted standards, thereby opening the door to the threat actor and causing the Data Breach.

### F. Defendant Owed Plaintiff and Class Members a Duty to Safeguard Their Private Information.

75. In addition to its obligations under federal and state laws, Defendant owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession, protecting it from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendant owed a duty to Plaintiff and Class Members to provide reasonable security and to ensure that its computer systems, networks, and protocols adequately protected the Private Information of Class Members.

76. Defendant owed a duty to Plaintiff and Class Members to create and implement reasonable data security practices and procedures to protect the Private Information in its possession, including adequately training its employees and others who accessed Private Information within its computer systems on how to adequately protect Private Information.

77. Defendant owed a duty to Plaintiff and Class Members to implement processes that would detect a compromise of Private Information in a timely manner.

78. Defendant owed a duty to Plaintiff and Class Members to act upon data security warnings and alerts in a timely fashion, including warnings and alerts about vulnerabilities in third-party software.

79. Defendant owed a duty to Plaintiff and Class Members to disclose in a timely and accurate manner when and how the Data Breach occurred, including by notifying its district customers, as the owners of the data, immediately upon discovery of the breach (see Cal. Civ. Code § 1798.82(b)), and by honoring its own representation that it would provide "prompt notification of the districts and educators in the event of a security or privacy breach of protected information."

80. Defendant owed a duty of care to Plaintiff and Class Members because they were foreseeable and probable victims of any inadequate data security practices.

81. Upon information and belief, Defendant breached these duties by, among other things, failing to: (a) timely apply available updates and patches; (b) identify and remediate vulnerabilities in third-party software used within its computer environment; (c) adequately monitor its environment for vulnerabilities, intrusions, and unauthorized access; (d) segment its environment to limit the Private Information accessible through any single vulnerable software product; (e) adequately oversee its third-party vendors; (f) encrypt Private Information; and (g) timely detect and stop unauthorized access.

**G. The Data Breach Increases Plaintiff's and Class Members' Risk of Identity Theft.**

82. The Private Information of Plaintiff and Class Members is likely to be disseminated and sold to criminals on the dark web, as that is the *modus operandi* of hackers.

83. Unencrypted Private Information may also fall into the hands of companies that will use the detailed data for targeted marketing without the approval of Plaintiff and Class Members.

84. Simply put, unauthorized individuals can easily access the Private Information of Plaintiff and Class Members because of the Data Breach.

85. Cyberattacks and data breaches at companies like Defendant are especially problematic because they can negatively impact the overall daily lives of individuals affected by the attack.

86. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize it. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity-theft-related crimes discussed below.

87. Plaintiff's and Class Members' Private Information is of great value to hackers and cyber criminals, and the data stolen in the Data Breach can be, and is likely to be, used in a variety of sordid ways for criminals to exploit Plaintiff and Class Members and to profit from their misfortune.

88. As a result of Defendant's failure to prevent the Data Breach, Plaintiff and the proposed Class have suffered or are at an increased risk of suffering damages, including monetary losses, lost time, anxiety, and emotional distress. They have suffered or are at an increased risk of suffering:

a. The loss of the opportunity to control how their Private Information is used;

b. The diminution in value of their Private Information;

c. The compromise and exposure of their Private Information;

d. Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

e. Lost opportunity costs and lost wages associated with the time and effort expended addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

f. Risk of unauthorized use of stolen Private Information; and

g. The continued risk to their Private Information, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake the appropriate measures to protect the Private Information in its possession.

89. Stolen Private Information is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PII alone can be worth up to $1,000.00 depending on the type of information obtained.

90. The value of Plaintiff's and the Class's Private Information on the black market is considerable. Stolen Private Information trades on the black market for years, and criminals frequently post stolen Private Information openly and directly on various "dark web" internet websites, making the information publicly available, for a substantial fee, of course.

91. It can take victims years to spot identity theft, giving criminals plenty of time to use that information for cash.

92. The dark web is an unindexed layer of the internet that requires special software or authentication to access.[13] Criminals in particular favor the dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or "surface" web, dark web users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov, but on the dark web the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion, preventing dark web marketplaces from being easily monitored by authorities or accessed by those not in the know.

93. A sophisticated black market exists on the dark web where criminals can buy or sell malware, firearms, drugs, and frequently, personal information like the Private Information at issue here. The digital character of Private Information stolen in data breaches lends itself to dark web transactions because it is immediately transmissible over the internet and the buyer and seller can retain their anonymity. The sale of a firearm or drugs, on the other hand, requires a physical delivery address. Nefarious actors can readily purchase usernames and passwords for online streaming services, stolen financial information and account login credentials, and Social Security numbers and dates of birth.

94. Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or to track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

---

[13] Louis DeNicola, *What Is the Dark Web?*, EXPERIAN (May 12, 2021), https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/.

95. One example of criminals using Private Information for profit is the development of "Fullz" packages.[14]

96. Cyber-criminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

97. The development of "Fullz" packages means that stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiff and the proposed Class's phone numbers, email addresses, and other unregulated sources and identifiers. In other words, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. Plaintiff's and the Class's Private Information is thus at serious risk of being misused in this manner.

98. Identity thieves can also use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud. Identity thieves will use Private Information to, among other things: open a

[14] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, Social Security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm*, KREBS ON SECURITY (Sept. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm/.

new credit card or loan, change a billing address so the victim no longer receives bills, open new utilities, obtain a mobile phone, open a bank account and write bad checks, use a debit card number to withdraw funds, obtain a new driver's license or ID, and/or use the victim's information in the event of arrest or court action.

99. Identity thieves can also use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, and/or rent a house or receive medical services in the victim's name.

100. Social Security numbers are particularly sensitive pieces of personal information. As the Consumer Federation of America explains:

> *This is the most dangerous type of personal information in the hands of identity thieves* because it can open the gate to serious fraud, from obtaining credit in your name to impersonating you to get medical services, government benefits, your tax refunds, employment – even using your identity in bankruptcy and other legal matters. It's hard to change your Social Security number and it's not a good idea because it is connected to your life in so many ways.[15] (Emphasis added).

101. The Social Security Administration has similarly warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[16] Such fraud may go undetected until debt collection calls commence months, or even years later. Stolen Social Security numbers also make it possible for thieves to file fraudulent tax returns, file for

---

[15] Susan Grant, *Consumers Are in the Dark About Dark Web Monitoring Services*, CONSUMER FED'N OF AMERICA (Mar. 20, 2019), https://consumerfed.org/consumers-are-in-the-dark-about-dark-web-monitoring-services/.

[16] SOC. SEC. ADMIN., *Identity Theft and Your Social Security Number*, at 1 (Mar. 2026), https://www.ssa.gov/pubs/EN-05-10064.pdf.

unemployment benefits, or apply for a job using a false identity.[17] Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected because one was already filed on their behalf.

102. Further, an individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[18]

103. Upon information and belief, this was a financially motivated Data Breach, as a principal reason cybercriminals go through the trouble of running a targeted cyberattack against a company like Defendant is to get information that they can monetize by selling on the black market for use in the kinds of criminal activity described herein. This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market."[19]

---

[17] *See id. at* 4.

[18] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), https://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft.

[19] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10X Price of Stolen Credit Card Numbers*, NETWORK WORLD (Feb. 6, 2015), https://www.networkworld.com/article/935334/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

104. Indeed, a Social Security number, date of birth, and full name can sell for $60 to $80 on the digital black market.[20]

105. These risks are both certainly impending and substantial. If hackers get access to Private Information, they will use it.

106. Identity theft victims must spend countless hours and large amounts of money repairing the impact to their credit as well as protecting themselves in the future.

107. In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims must spend a considerable time repairing the damage caused by the theft of their Private Information. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

108. Frontline's delay in notifying the Class of the Data Breach (individual notices are not expected to begin until on or about October 17, 2026, more than nine weeks after Frontline identified the vulnerability) exacerbated Plaintiff's and the Class's injury by depriving them of the earliest ability to take appropriate measures to protect their Private Information and take other necessary steps to mitigate the harm caused by the Data Breach.

**H. Loss of Time to Mitigate the Risk of Identity Theft and Fraud.**

109. As a result of the recognized risk of identity theft, when a data breach occurs and an individual is notified by an employer that their Private Information was potentially compromised and is advised to stay vigilant about unsolicited communications and to consider

---

[20] Michael Kan, *Here's How Much Your Identity Goes for on the Dark Web*, PC MAG (Nov. 15, 2017), https://www.pcmag.com/news/heres-how-much-your-identity-goes-for-on-the-dark-web.

credit monitoring and a credit freeze, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft or fraud. Failure to spend time reviewing accounts or credit reports could expose the individual to greater financial harm.

110. Thus, due to the actual and imminent risk of identity theft, Plaintiff and Class Members must monitor their financial accounts for many years to mitigate the risk of identity theft.

111. Plaintiff and Class Members will need to spend, and will spend additional time in the future, on a variety of prudent actions, such as changing passwords and re-securing their own computer systems.

112. Plaintiff's mitigation efforts are consistent with the U.S. Government Accountability Office's 2007 report regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[21]

113. Plaintiff's mitigation efforts are also consistent with the steps the FTC recommends data breach victims take to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (and considering an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a freeze on their credit, and correcting their credit reports.[22]

---

[21] *See* U.S. GOV'T ACCOUNTABILITY OFF., GAO-07-737, *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* (June 2007), https://www.gao.gov/new.items/d07737.pdf.

[22] *See* FED. TRADE COMM'N, *IdentityTheft.gov*, https://www.identitytheft.gov/Steps (last visited Oct. 12, 2026).

**I. Diminution of Value of Private Information.**

114. Private Information is valuable property. Its value is axiomatic, considering the value of Big Data in corporate America and that the consequences of cyber thefts include heavy prison sentences. Even this obvious risk-to-reward analysis illustrates, beyond doubt, that Private Information has considerable market value.

115. The Private Information stolen in the Data Breach is significantly more valuable than the loss of, say, credit card information in a large retailer data breach. Victims affected by those retailer breaches could avoid much of the potential future harm by simply cancelling credit or debit cards and obtaining replacements. The information stolen in the Data Breach is difficult, if not impossible, to change.

116. Private Information can sell for hundreds of dollars, as set forth above.

117. An active and robust legitimate marketplace for Private Information also exists. The data brokering industry is worth roughly $200 billion.[23] In fact, the data marketplace is so sophisticated that consumers can sell their non-public information directly to a data broker, who in turn, aggregates the information and provides it to marketers or app developers.[24] [25]

118. As a result of the Data Breach, Plaintiff's and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred

---

[23] *See* Elizabeth Goitein & Emile Ayoub, *Data Brokers Are Running Wild, and Only Congress Can Rein Them In*, BRENNAN CTR. FOR JUST. (Feb. 13, 2024), https://www.brennancenter.org/our-work/analysis-opinion/data-brokers-are-running-wild-and-only-congress-can-rein-them.

[24] David Lazarus, *Shadowy Data Brokers Make the Most of Their Invisibility Cloak*, LOS ANGELES TIMES (Nov. 5, 2019), https://www.latimes.com/business/story/2019-11-05/column-data-brokers.

[25] DATACOUP, https://datacoup.com/ (last visited Oct. 12, 2026).

without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, upon information and belief, the Private Information is now more readily available to criminals, and the rarity of the data has been lost, thereby causing additional loss of value.

119. Further fraudulent activity resulting from the Data Breach may not come to light for years.

120. Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. Plaintiff and Class Members are incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

121. The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class Members.

### J. The Future Cost of Credit and Identity Theft Monitoring Is Reasonable and Necessary.

122. Given the nature of the attack, the volume of data compromised in this Data Breach, and the sensitive type of Private Information involved in this Data Breach, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes—e.g., opening bank accounts in the victims' names to make purchases or to launder money; filing false tax returns; taking out loans or lines of credit; or filing false unemployment claims.

123. Such fraud may go undetected until debt collection calls commence months, or even years later. An individual may not know that their Private Information was used to file for

unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

124. Consequently, Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future.

125. The retail cost of credit monitoring and identity theft monitoring is around $200 a year per Class Member. This is a reasonable and necessary cost to monitor and protect Class Members from the risk of identity theft resulting from Defendant's Data Breach. Frontline has offered only two years of credit monitoring. That offer is inadequate because stolen data may be held for a year or more before use and misused for years afterward, and Social Security numbers cannot readily be changed. This is a future cost that Plaintiff and Class Members would not need to bear, but for Defendant's failure to safeguard their Private Information.

**K. Loss of the Benefit of the Bargain.**

126. Furthermore, Defendant's poor data security deprived Plaintiff and Class Members of the benefit of their bargain. Defendant's district customers paid fees for services that included reasonable data security for their employees' Private Information. Frontline retained those fees without providing the security paid for, and Plaintiff and Class Members, the intended beneficiaries of that security, did not receive the benefit of that bargain. Accordingly, Plaintiff and Class Members received services that were of a lesser value than what they reasonably expected to receive under the bargains they and/or their employers struck with Defendant.

**L. Plaintiff's Experience.**

127. Plaintiff Rezayat is a current employee of the Glendale Unified School District ("GUSD"). As a condition of obtaining employment with GUSD, Plaintiff was required to provide

her Private Information, including her Social Security number and home address, to GUSD. GUSD uses Frontline's software for its personnel records and, in the course of using it, provided Plaintiff's Private Information to Frontline.

128. Plaintiff's Private Information was entrusted to GUSD, and through GUSD to Frontline, with the reasonable expectation that Frontline would keep it confidential and secure from unauthorized access. Had Plaintiff known that Frontline would maintain her Private Information using inadequate data security, she would not have consented to its being entrusted to Frontline.

129. Plaintiff greatly values her privacy and is careful about sharing her sensitive Private Information. Plaintiff diligently protects her Private Information and stores documents containing it in a safe and secure location. Specifically, Plaintiff uses strong and unique passwords for her online accounts, shreds sensitive financial documents, reviews her credit report, and declines to share her personal information whenever feasible.

130. At the time of the Data Breach, Frontline retained Plaintiff's Private Information in its computer environment. Upon information and belief, that environment was inadequately secured, which made it possible for an unauthorized actor to access and/or acquire Plaintiff's Private Information in the Data Breach.

131. On or about October 6, 2026, Plaintiff received an email from GUSD's Assistant Superintendent of Business Services informing her that Frontline's data security was "compromised on August 14, 2026," potentially affecting current and former GUSD employees and applicants, and that the accessed data "may have included Social Security numbers, home addresses, and email addresses." The Notice further stated that individuals whose information was involved would receive a separate notice from Frontline and TransUnion beginning on or about

October 17, 2026, along with two years of credit monitoring and identity theft protection.

132. Because GUSD uses Frontline for its personnel records, and the Notice reports that the incident impacted GUSD's personnel data, Plaintiff, an employee of GUSD, believes, upon information and belief, that her Private Information was among the data compromised in the Data Breach.

133. Plaintiff further believes that her Private Information, and that of Class Members, is likely to be sold and disseminated on illicit criminal networks, including through the dark web, following the Data Breach.

134. Consistent with the Notice's advice that all staff consider proactive credit monitoring and a credit freeze, Plaintiff has made reasonable efforts to mitigate the impact of the Data Breach, including researching the Data Breach; reviewing credit reports and financial account statements for indications of attempted or actual identity theft or fraud; placing a freeze on her credit file; enrolling in credit monitoring; and changing her passwords on at-risk accounts. Plaintiff has spent multiple hours dealing with the Data Breach, valuable time she otherwise would have spent on other professional and/or personal activities.

135. Plaintiff anticipates spending considerable time and money on an ongoing basis in an effort to mitigate and address the harms caused by the Data Breach.

136. Due to the Data Breach, Plaintiff is at present risk and will continue to be at increased risk of identity theft and fraud for years to come.

137. The risk of identity theft is impending and substantial, as Plaintiff's Private Information was targeted and accessed in a deliberate attack on Frontline's systems by an unauthorized actor.

138. Upon information and belief, Frontline continues to maintain Plaintiff's Private

Information, and GUSD continues to use Frontline's software for its personnel records. Plaintiff therefore has a continuing interest in ensuring that her Private Information is protected and safeguarded from future breaches.

139. The Data Breach has also caused Plaintiff to suffer fear, anxiety, and stress about her Private Information being in the hands of cybercriminals, and she feels she must remain vigilant about her finances, identity, and online accounts on an indefinite basis.

140. As a direct and traceable result of the Data Breach, Plaintiff suffered actual injury and damages after her Private Information was compromised in the Data Breach, including, but not limited to: (a) lost time related to monitoring her financial and credit accounts and credit reports for fraudulent activity; (b) loss of privacy and deprivation of the right to exclude others from accessing her Private Information due to its being accessed by an unauthorized actor; (c) loss of the benefit of the bargain; (d) imminent and impending injury arising from the increased risk of fraud and identity theft now that her Private Information has been accessed by an unauthorized actor and is likely to be sold on the dark web; (e) diminution in the value of her Private Information, a form of intangible property that Frontline obtained from Plaintiff through her employer; and (f) other economic and non-economic harm.

## CLASS ALLEGATIONS

141. Plaintiff brings this class action, individually and on behalf of the following nationwide Class defined as:

> All individuals whose Private Information was accessed and/or acquired by an unauthorized party in the Data Breach (the "Class").

142. Plaintiff Rezayat separately seeks to represent a California Subclass defined as:

> All residents of the state of California whose Private Information was accessed and/or acquired by an unauthorized party in the Data Breach (the "California Subclass").

143. Specifically excluded from the Class and Subclass are Defendant, its officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, principals, servants, partners, joint venturers, or entities controlled by Defendant, and its heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or its officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

144. Plaintiff reserves the right to amend the Class definitions above if further investigation and/or discovery reveals that the Class should be expanded, narrowed, divided into subclasses, or otherwise modified in any way.

145. This action may be certified as a class action under Federal Rules of Civil Procedure 23(a), 23(b)(2), 23(b)(3), and 23(c)(4) because it satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23. In the alternative, the common issues of duty, breach, and causation may be certified for class-wide resolution under Rule 23(c)(4).

146. Numerosity: The Class is so numerous that joinder of all Class Members is impracticable. Upon information and belief, the Class likely comprises hundreds of thousands of individuals, as Frontline provides its software to school districts across the country and has already quantified the number of affected employees for at least some of those districts. Upon information and belief, the California Subclass likewise comprises at least thousands of members, including current and former employees and applicants of California school districts such as GUSD. The Class and Subclass are sufficiently numerous to warrant certification.

147. Typicality of Claims: Plaintiff's claims are typical of those of other Class Members because Plaintiff, like the unnamed Class, had her Private Information accessed in the Data Breach. Plaintiff is a member of the Class and the California Subclass, and her claims are typical of the

claims of the members of each. The harm suffered by Plaintiff is similar to that suffered by all other Class Members, which was caused by the same misconduct by Frontline, and her claims arise from the same operative facts and legal theories.

148. Adequacy of Representation: Plaintiff will fairly and adequately represent and protect the interests of the Class and the California Subclass. Plaintiff has no interests antagonistic to, nor in conflict with, the Class. Plaintiff has a genuine personal interest in the outcome of this action and understands her duties as a class representative. Plaintiff has retained competent counsel who are experienced in data breach and complex class action litigation and who will prosecute this action vigorously.

149. Superiority: A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the monetary damages suffered by individual Class Members are relatively small, the expense and burden of individual litigation make it impossible for individual Class Members to seek redress for the wrongful conduct asserted herein. Many Class Members also likely remain unaware of the claims they may possess. A class action will preserve judicial resources by allowing the Class's common issues to be adjudicated once, in a single forum. If Class treatment of these claims is not available, Frontline will likely continue its wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for its wrongdoing as asserted herein.

150. Predominant Common Questions: The claims of all Class Members present common questions of law or fact, and those common questions predominate over any questions affecting only individual Class Members, including:

a. Whether an unauthorized actor accessed and/or acquired Class Members' Private Information in the Data Breach;

b. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations and industry standards;

d. Whether Defendant failed to timely identify and remediate the vulnerability exploited in the Data Breach;

e. Whether Defendant's storage of Plaintiff's and Class Members' Private Information was done in a negligent manner;

f. Whether Defendant had a duty to protect and safeguard Plaintiff's and Class Members' Private Information;

g. Whether Defendant's conduct was negligent;

h. Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

i. Whether Defendant took sufficient steps to protect individuals' Private Information;

j. Whether Defendant failed to provide timely and adequate notice of the Data Breach;

k. Whether Defendant entered into contracts with school districts and other education organizations that obligated it to maintain reasonable data security for their employees' Private Information, and whether Plaintiff and Class Members were intended third-party beneficiaries of those contracts;

l. Whether Defendant breached those contracts;

m. Whether Defendant received a benefit from Plaintiff's and Class Members' Private Information, and whether it would be unjust for Defendant to retain that benefit, including the data security costs it avoided;

n. Whether Defendant's Privacy Policy and its conduct in accepting Plaintiff's and Class Members' Private Information gave rise to implied contracts, and whether Defendant breached them; and

o. The nature of relief, including damages and equitable relief, to which Plaintiff and Class Members are entitled.

151. These common questions arise from Frontline's uniform conduct toward all Class Members and the same Data Breach, and resolving them will advance the claims of every Class Member at once.

152. The following questions are also common to the California Subclass and predominate over any individual questions: (a) whether Defendant is a "business" under Cal. Civ. Code § 1798.140(d); (b) whether Subclass Members' personal information, as defined in Cal. Civ. Code § 1798.81.5(d)(1)(A), was subject to unauthorized access and exfiltration, theft, or disclosure as a result of Defendant's failure to implement and maintain reasonable security procedures and practices; and (c) whether Subclass Members are entitled to actual or statutory damages and to injunctive and declaratory relief under Cal. Civ. Code § 1798.150.

153. Information concerning Defendant's policies and practices is available from Defendant's records, and Plaintiff knows of no difficulty that will be encountered in the management of this litigation which would preclude its maintenance as a class action. Class Members are identifiable from Defendant's records and those of its district customers, Defendant

has already identified at least some affected individuals in notifying those districts, and notice can be given directly to Class Members using that information.

154. The prosecution of separate actions by individual members of the Class would run the risk of inconsistent or varying adjudications and establish incompatible standards of conduct for Defendant. Prosecution as a class action will eliminate the possibility of repetitious and inefficient litigation.

155. Defendant has acted or refused to act on grounds generally applicable to the Class, making final injunctive and declaratory relief appropriate for the Class as a whole. Upon information and belief, Defendant continues to maintain Class Members' Private Information, and it has not publicly disclosed the root cause of the Data Breach or the remedial measures it has taken.

156. Given that Defendant has not publicly disclosed any changes to its security measures, monetary damages are an insufficient remedy, and Plaintiff thus has no complete and adequate remedy at law.

**COUNT I**
**Negligence**
**(On Behalf of Plaintiff and the Nationwide Class)**

157. Plaintiff restates and realleges all of the allegations contained in the preceding paragraphs as if fully set forth herein.

158. Defendant knowingly collected, possessed, and maintained Plaintiff's and Class Members' Private Information, and therefore had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being disclosed, compromised, lost, stolen, and misused by unauthorized parties.

159. Defendant's duty also included a responsibility to implement processes by which it

could detect and analyze a breach of its security systems quickly and to give prompt notice of any breach to its district customers and to the individuals affected.

160. Defendant knew or should have known of the risks inherent in collecting the Private Information of Plaintiff and Class Members and the importance of adequate security. Frontline was on notice because, on information and belief, it knew or should have known that it would be an attractive target for cyberattacks, including in light of recent breaches at other K-12 education technology providers.

161. Defendant owed a duty of care to Plaintiff and Class Members, whose Private Information was entrusted to it through their employers. Frontline's duties included, but were not limited to, the following:

a. To exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting Private Information in its possession;

b. To protect the Private Information in its possession using reasonable and adequate security procedures and systems compliant with industry standards;

c. To have procedures in place to prevent the loss or unauthorized dissemination of Private Information in its possession;

d. To employ reasonable security measures and otherwise protect the Private Information of Plaintiff and Class Members pursuant to the FTC Act and Cal. Civ. Code § 1798.81.5(b);

e. To implement processes to quickly detect a data breach and to timely act on warnings about data breaches and about vulnerabilities in third-party software used in its systems; and

f. To promptly notify its district customers, and Plaintiff and Class Members, of the Data Breach, and to precisely disclose the type(s) of information compromised.

162. Defendant's duty to employ reasonable data security measures arose, in part, under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

163. Defendant's duty also arose because Frontline was bound by industry standards, and by its own express representations in its Privacy Policy, to protect the confidential Private Information entrusted to it.

164. Additionally, Defendant's duty arose from its own affirmative conduct. Defendant chose to collect and store Plaintiff's and Class Members' Private Information, including their Social Security numbers, in its computer environment, and in doing so created a foreseeable risk of harm to them if that environment was not reasonably secured.

165. Plaintiff and Class Members were foreseeable victims of any inadequate security practices on the part of Defendant, and Defendant owed them a duty of care to not subject them to an unreasonable risk of harm.

166. Defendant, through its actions and/or omissions, unlawfully breached its duty to Plaintiff and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiff's and Class Members' Private Information within Defendant's possession.

167. Defendant, by its actions and/or omissions, breached its duty of care by failing to provide, or acting with reckless disregard for, fair, reasonable, or adequate computer systems and data security practices to safeguard the Private Information of Plaintiff and Class Members.

168. Defendant, by its actions and/or omissions, breached its duty of care by failing to timely identify and remediate the vulnerability exploited in the Data Breach and by failing to provide prompt notice of the Data Breach to its district customers and to the persons whose Private Information was compromised.

169. Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Plaintiff's and Class Members' Private Information. Upon information and belief, the specific negligent acts and omissions committed by Frontline include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

b. Failing to timely apply available updates and patches and to identify and remediate vulnerabilities in third-party software used in its systems;

c. Failing to adequately monitor the security of its networks and systems;

d. Allowing unauthorized access to Class Members' Private Information;

e. Failing to comply with the FTC Act;

f. Failing to detect in a timely manner that Class Members' Private Information had been compromised; and

g. Failing to timely notify its district customers and Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

170. Defendant acted with reckless disregard for the rights of Plaintiff and Class Members by failing to provide prompt and adequate individual notice of the Data Breach such that Plaintiff and Class Members could take measures to protect themselves from harms caused by the

fraudulent use of the Private Information compromised in the Data Breach.

171. Defendant had a special relationship with Plaintiff and Class Members. Their Private Information was entrusted to Frontline, through their employers, on the understanding that Frontline, which represents that it "maintains strict administrative, technical and physical procedures to protect information stored in our servers," would take adequate security precautions. Plaintiff and Class Members had no ability to protect their Private Information once it was in Frontline's systems. Only Frontline had the ability to protect its systems (and the Private Information stored on them) from attack.

172. The imposition of a duty of care on Defendant is appropriate because any social utility of Defendant's conduct is outweighed by the injuries suffered by Plaintiff and Class Members as a result of the Data Breach.

173. Defendant's breach of duties owed to Plaintiff and Class Members caused Plaintiff's and Class Members' Private Information to be accessed and/or acquired by an unauthorized actor, as alleged herein.

174. As a result of Defendant's delay in notifying its district customers and Plaintiff and Class Members regarding the Data Breach, Plaintiff and Class Members were unable to take the necessary precautions, such as placing credit freezes and fraud alerts and monitoring their accounts, to prevent future fraud and mitigate damages.

175. Defendant's breaches of duty also caused a substantial, imminent risk to Plaintiff and Class Members of identity theft, loss of control over their Private Information, and loss of time and money to monitor their accounts for fraud.

176. As a result of Defendant's negligence in breach of its duties owed to Plaintiff and Class Members, Plaintiff and Class Members are in danger of imminent harm in that their Private

Information, which an unauthorized actor accessed and which may remain in the possession of third parties, is likely to be used for fraudulent purposes.

177. Defendant also had independent duties under state laws that required it to reasonably safeguard Plaintiff's and Class Members' Private Information and promptly notify them about the Data Breach.

178. Defendant's negligent conduct is ongoing. Upon information and belief, Frontline continues to hold Plaintiff's and Class Members' Private Information in an unsafe and unsecure manner.

179. As a direct and proximate result of Defendant's negligent conduct, Plaintiff and Class Members have suffered damages as alleged herein and are at imminent risk of further harm.

180. The injury and harm that Plaintiff and Class Members suffered was reasonably foreseeable.

181. Plaintiff and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial.

182. In addition to monetary relief, Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, *inter alia*, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members.

## COUNT II
**Breach of Third-Party Beneficiary Contract**
**(On Behalf of Plaintiff and the Nationwide Class)**

183. Plaintiff restates and realleges all of the allegations contained in the preceding paragraphs as if fully set forth herein.

184. Upon information and belief, Defendant entered into written contracts with its

school district and education organization customers, including GUSD, under which Frontline agreed to provide its software and services and, in doing so, to receive, store, and process the Private Information of those customers' employees. Defendant's customers entered into these contracts for the purpose of managing their workforces, including their personnel records, hiring and onboarding, and payroll data. Upon information and belief, these contracts, or at a minimum their data security provisions, are materially identical between and among Defendant and its customers around the country. Defendant and its customers entered into those contracts for the express benefit of the customers' employees, like Plaintiff and the Class, whose Private Information Frontline would be receiving and storing.

185. Through these contracts, Defendant agreed, in part, to implement and maintain reasonable administrative, technical, and physical safeguards to protect the confidentiality and security of Plaintiff's and the Class's Private Information and to protect it from unauthorized access and disclosure, consistent with the representations in Frontline's Privacy Policy. Defendant's customers would not have entered into contracts with Frontline had they known that Frontline would fail to protect their employees' information. Defendant and its customers thus intended, at the time the contracts were made, that Frontline would assume a direct obligation to protect Plaintiff's and Class Members' Private Information.

186. Plaintiff and Class Members would in fact benefit from these data security provisions, and a motivating purpose of the contracting parties in including them was to benefit those individuals. The provisions exist to protect the people to whom the Private Information pertains, whose information is the very subject of Defendant's services. Permitting Plaintiff and Class Members to enforce them is consistent with the objectives of the contracts and the reasonable expectations of the contracting parties, and is appropriate to effectuate the parties' intention.

187. These contracts were made expressly for the benefit of Plaintiff and the Class, as Plaintiff and Class Members were the intended third-party beneficiaries of the contracts between Frontline and its customers. Frontline knew that if it were to breach these contracts, its customers' employees, Plaintiff and Class Members, would be harmed.

188. Upon information and belief, GUSD and Frontline's other customers performed their obligations under these contracts, including by paying Defendant for its services, or were excused from doing so.

189. Upon information and belief, Defendant breached the contracts it entered into with its customers by, among other things, failing to (i) use reasonable data security measures, (ii) implement adequate protocols and employee training sufficient to protect Plaintiff's Private Information from unauthorized disclosure to third parties, (iii) timely identify and remediate the vulnerability exploited in the Data Breach, and (iv) promptly and adequately detect the Data Breach and notify its customers and Plaintiff and Class Members of it.

190. Plaintiff and the Class were harmed by Defendant's breach of its contracts with its customers, as such breach is alleged herein, and are entitled to the losses and damages they have sustained as a direct and proximate result thereof.

## COUNT III
## Unjust Enrichment
## (On Behalf of Plaintiff and the Nationwide Class)

191. Plaintiff restates and realleges all of the allegations contained in the preceding paragraphs as if fully set forth herein.

192. This Count is pleaded in the alternative to Count II above and to Count IV below.

193. Plaintiff and Class Members conferred a benefit on Defendant in the form of their Private Information, which was provided to Frontline through their employers and which Frontline

used to provide services to those employers. Defendant could not have provided those services, or been paid for them, without that Private Information.

194. Moreover, upon information and belief, the fees Defendant received from its customers for those services included amounts intended to cover the cost of reasonable data security to protect Plaintiff's and Class Members' Private Information. But Plaintiff and Class Members did not receive such protection.

195. Upon information and belief, Defendant funds its data security measures from its general revenue, which it earns from its customers' payments for the services it provides. Defendant collected fees calculated, at least in part, to cover such costs, but instead retained those amounts and directed them to its own profit by forgoing basic, industry-standard security measures, such as timely patching of vulnerabilities, encryption, and network segmentation, as alleged above.

196. As such, a portion of the payments Defendant receives is to be used to provide a reasonable and adequate level of data security that complies with applicable state and federal regulations and industry standards, and the amount of the portion of each payment allocated to data security is known to Defendant.

197. Defendant enriched itself by saving the costs it reasonably should have expended on data security. Instead of providing a level of security that would have prevented the Data Breach, Defendant increased its own profits at the expense of Plaintiff and Class Members by using cheaper, less effective security measures.

198. Defendant also publicly represented, including in its Privacy Policy, that it "maintains strict administrative, technical and physical procedures to protect information stored in our servers," that it stores and processes data "in accordance with industry best practices," and that

it "will conduct periodic risk assessments and remediate any identified security vulnerabilities in a timely manner." Those representations caused Plaintiff and Class Members reasonably to believe that their Private Information would be kept secure. Upon information and belief, Frontline did not disclose to Plaintiff, Class Members, or their employers the inadequate security practices alleged above.

199. Defendant has retained the benefits of its unlawful conduct, retaining the amounts of payments received from Plaintiff's and Class Members' employers on their behalf that should have been used to implement adequate cybersecurity practices, but that Defendant failed to provide.

200. Defendant knew that Plaintiff and Class Members conferred a benefit upon it, and it accepted that benefit. Defendant profited from these transactions and used Plaintiff's and Class Members' Private Information for business purposes, while failing to use the payments it received for adequate data security measures that would have secured their Private Information and prevented the Data Breach.

201. Had Plaintiff and Class Members known that Defendant had not adequately secured their Private Information, they would have objected to its being provided to Frontline.

202. Under the principles of equity and good conscience, it would be unjust and inequitable for Frontline to be permitted to retain the benefits it derived from Plaintiff's and Class Members' Private Information, including the fees it earned through the use of that information and the data security costs it avoided, in light of its conduct alleged herein.

203. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered, and/or are at a continued, imminent risk of suffering, injury that includes but is not limited to the following: (i) the loss of the opportunity to control how their Private

Information is used; (ii) the compromise and exposure of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their Private Information; (iv) lost opportunity costs and loss of productivity associated with efforts to address and mitigate the actual and future consequences of the Data Breach, including efforts spent researching how to prevent, detect, contest, and recover from identity theft; (v) the continued risk to their Private Information, which remains in Frontline's possession and is subject to further unauthorized disclosures so long as Frontline fails to undertake appropriate and adequate measures to protect it; and (vi) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised in the Data Breach for the remainder of the lives of Plaintiff and Class Members.

204. Plaintiff and Class Members are entitled to restitution and/or an order proportionally disgorging all profits, benefits, and other compensation Frontline obtained from its wrongful conduct, including the data security costs it avoided. This can be accomplished by establishing a constructive trust or common fund from which Plaintiff and Class Members may seek restitution or compensation.

205. Plaintiff and Class Members have no adequate remedy at law, and accordingly plead this claim in the alternative to their other claims. Legal damages measure Plaintiff's and Class Members' losses, not the benefit Frontline unjustly retained, and their remedies under the other claims pleaded may be limited by the terms of contracts to which they are not parties.

**COUNT IV**
**Breach of Implied Contract**
**(On Behalf of Plaintiff and the Nationwide Class)**

206. Plaintiff restates and realleges all of the allegations contained in the preceding paragraphs as if fully set forth herein.

207. Plaintiff and Class Members were required to provide their Private Information to their employers, the school districts and education organizations that use Frontline's software, as a condition of applying for and obtaining employment. Those employers, in turn, delivered that Private Information to Frontline so that Frontline could perform services for them.

208. Defendant invited that delivery, and the trust that accompanied it, by publicly promising to protect the information it receives. Defendant's Privacy Policy acknowledges that it receives information about school employees, including their Social Security numbers. It states that Frontline "maintains strict administrative, technical and physical procedures to protect information stored in our servers," that it processes data "in accordance with industry best practices," and that it "will conduct periodic risk assessments and remediate any identified security vulnerabilities in a timely manner." Defendant further represents that it has "a written incident response plan, to include prompt notification of the districts and educators in the event of a security or privacy breach of protected information."

209. By accepting Plaintiff's and Class Members' Private Information in order to provide services to their employers, and by publicly promising to protect that information, Defendant entered into an implied contract with Plaintiff and each Class Member under which it would safeguard their Private Information. Defendant manifested its assent to those terms through its conduct in accepting, retaining, and profiting from that information.

210. Plaintiff and Class Members furnished consideration for Defendant's promises. They placed their Private Information, and with it control over that information, in Defendant's hands, and that information was indispensable to Defendant's ability to provide its services and earn its fees.

211. Under these implied contracts, Defendant agreed, among other things, to: (1) ensure that anyone granted access to Private Information likewise protects its confidentiality; (2) limit access to Private Information to qualified, trained employees and agents, and only as needed for authorized business purposes; (3) apply appropriate encryption and/or separate data sets containing Private Information; (4) adopt and follow appropriate retention policies; (5) conduct periodic risk assessments and timely remediate identified security vulnerabilities; (6) promptly notify the affected districts and individuals in the event of a breach; and (7) take other reasonable steps to guard against foreseeable breaches. Each such contract also carried an implied covenant of good faith and fair dealing, under which Frontline was required to handle Plaintiff's and Class Members' data in a manner consistent with the reasonable expectations of privacy and protection of those who entrusted it.

212. Plaintiff and Class Members reasonably understood and expected that Defendant's data security practices would comply with applicable laws and regulations and be consistent with industry standards.

213. Absent Defendant's promise to protect that information, Plaintiff's and Class Members' Private Information would not have been entrusted to Frontline.

214. Plaintiff and Class Members fully performed their obligations under the implied contracts.

215. Defendant breached these implied contracts by failing to employ reasonable and adequate security measures to protect Plaintiff's and Class Members' Private Information, including by failing to timely identify and remediate the vulnerability exploited in the Data Breach, and by failing to promptly notify those affected.

216. As a direct and proximate result of Defendant's breaches, Plaintiff and Class Members have been injured and are entitled to damages, including actual, consequential, and nominal damages, in an amount to be proven at trial. Their injuries include the harms described above: the compromise and exposure of their Private Information, an increased and imminent risk of identity theft and fraud, lost time and out-of-pocket costs spent mitigating that risk, diminution in the value of their Private Information, and the loss of the data protection that Frontline promised.

## COUNT V
**Violations of the California Consumer Privacy Act (CCPA)**
**Cal. Civ. Code Section 1798.150, *et seq.***
**(On Behalf of Plaintiff Rezayat and the California Subclass)**

217. Plaintiff restates and realleges all of the allegations contained in the preceding paragraphs as if fully set forth herein.

218. Plaintiff brings this claim individually and on behalf of the members of the California Subclass.

219. Plaintiff and the members of the California Subclass are "consumers" as defined in Cal. Civ. Code § 1798.140(i), because they are natural persons who are California residents.

220. Defendant is a limited liability company organized or operated for the profit or financial benefit of its owners. It does business in California, including by providing software and services to California school districts such as GUSD, and it collects the personal information of California consumers and, alone or jointly with others, determines the purposes and means of processing it. Upon information and belief, Frontline's annual gross revenues exceed the threshold

set by Cal. Civ. Code § 1798.140(d)(1)(A) (currently $26,625,000). Defendant is therefore a "business" as defined in § 1798.140(d).

221. The Private Information accessed in the Data Breach constitutes "personal information" as defined in Cal. Civ. Code §§ 1798.150(a)(1) and 1798.81.5(d)(1)(A), because, upon information and belief, it included Plaintiff's and California Subclass Members' first names or first initials and last names in combination with their Social Security numbers.

222. Upon information and belief, that personal information was not encrypted or redacted. Among other things, GUSD has notified its employees of the Data Breach, and Frontline has told its customers that it will notify affected individuals and offer them credit monitoring and identity theft protection. California law requires such notice where unencrypted personal information was, or is reasonably believed to have been, acquired by an unauthorized person. Cal. Civ. Code §§ 1798.29(a), 1798.82(a).

223. The personal information at issue was collected and maintained by Frontline in connection with school districts' personnel records. It was not maintained, used, or disclosed as protected health information or medical information, and no exemption from § 1798.150 applies to it.

224. Upon information and belief, the Data Breach resulted in the unauthorized access and exfiltration, theft, or disclosure of this personal information. The unauthorized actor deliberately exploited a vulnerability in third-party software to reach files containing it, and Frontline has offered affected individuals two years of credit monitoring and identity theft protection, reflecting its own assessment that the information is at risk of misuse.

225. This unauthorized access and exfiltration, theft, or disclosure occurred as a direct result of Defendant's failure to implement and maintain reasonable security procedures and

practices appropriate to the nature of the information, as detailed herein, including its failure to timely identify and remediate a vulnerability in third-party software.

226. Defendant had and has a duty to implement and maintain reasonable security procedures and practices appropriate to the nature of Plaintiff's and California Subclass Members' personal information in order to protect it. Defendant failed to do so, and by failing to protect that information from unauthorized access and exfiltration, theft, or disclosure, Defendant violated § 1798.150 of the CCPA.

227. Defendant's actions directly and proximately caused Plaintiff's and California Subclass Members' personal information, including, upon information and belief, their names, Social Security numbers, home addresses, and email addresses, to be subjected to unauthorized access and exfiltration, theft, or disclosure.

228. Plaintiff and California Subclass Members seek injunctive and declaratory relief in the form of an order enjoining Defendant from continuing to violate the CCPA, pursuant to Cal. Civ. Code § 1798.150(a)(1)(B). Such relief is necessary to ensure that Defendant secures California consumers' Private Information by implementing sufficient data security procedures and practices. Upon information and belief, Defendant continues to hold that information, rendering this relief particularly important. Plaintiff and California Subclass Members have an interest in ensuring that their Private Information is reasonably protected, and Frontline has demonstrated its inability to safeguard it through the Data Breach.

229. An actual controversy exists as to whether Defendant has implemented and maintained adequate security procedures and practices under the CCPA in relation to the nature of the information, and judicial intervention is necessary and appropriate to prevent further breaches of Plaintiff's and California Subclass Members' Private Information.

230. On or about October 12, 2026, Plaintiff sent Frontline written notice pursuant to Cal. Civ. Code § 1798.150(b) identifying the specific provisions of the CCPA that Frontline has violated. Plaintiff presently seeks actual damages and injunctive and declaratory relief, and will amend this Complaint to seek statutory damages if Frontline fails to cure within 30 days of that notice.

231. In determining statutory damages, the Court may consider the factors listed in § 1798.150(a)(2), including the nature and seriousness of Frontline's misconduct, the number of violations, the persistence and willfulness of the misconduct, and Frontline's assets, liabilities, and net worth. Frontline was acquired by Roper Technologies, Inc. in October 2022 in a transaction valuing it at approximately $3.7 billion.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and the Class and California Subclass described above, seeks the following relief:

a. An order certifying this action as a class action under Federal Rules of Civil Procedure 23(a), 23(b)(2), 23(b)(3), and 23(c)(4), defining the Class and California Subclass as requested herein, appointing Plaintiff as the representative of the Class and California Subclass, and appointing the undersigned as Class Counsel under Rule 23(g);

b. Judgment in favor of Plaintiff and Class Members awarding them appropriate monetary relief, including actual, consequential, and nominal damages, restitution, and disgorgement, and, for the California Subclass, actual damages under Cal. Civ. Code § 1798.150(a)(1)(A);

c. A declaration that Frontline owed Plaintiff and Class Members a duty to reasonably safeguard their Private Information, that it breached that duty, and that its data security measures remain inadequate;

d. An order providing injunctive and other equitable relief necessary to protect the interests of the Class and California Subclass, including an order:

   i. requiring Frontline to implement and maintain a comprehensive information security program designed to protect the confidentiality and integrity of Private Information;

   ii. requiring Frontline to encrypt Private Information at rest and in transit, to require multi-factor authentication for access to it, and to segment its systems and data so that the compromise of one system or customer's data does not expose other systems or customers' data;

   iii. requiring Frontline to implement a vulnerability and patch management program, including timely identification and remediation of vulnerabilities in third-party software, and to audit and oversee its third-party vendors;

   iv. requiring Frontline to engage independent third-party security auditors and penetration testers to test its systems periodically, and to promptly correct any problems they identify;

   v. requiring Frontline to conduct regular database scanning and to implement logging and monitoring sufficient to detect unauthorized access and large-scale data transfers;

vi. requiring Frontline to establish an information security training program, including at least annual training for all employees with access to Private Information;

vii. requiring Frontline to delete, destroy, and purge the Private Information of Plaintiff and Class Members, including former employees and applicants, that it no longer needs for a legitimate purpose, unless it provides the Court a reasonable justification for retaining it;

viii. requiring Frontline to adopt incident response and notification procedures that ensure prompt notice to its customers and to affected individuals, and to disclose to Class Members the root cause of the Data Breach, the vulnerabilities exploited, the categories of information compromised, and the remedial measures taken; and

ix. requiring, for a period of not less than five years, an independent third-party assessor to conduct an annual SOC 2 Type 2 attestation (or equivalent independent assessment) of Frontline's compliance with the Court's judgment, with reports to the Court and Class Counsel;

e. An order requiring Frontline to purchase or provide funds for lifetime credit monitoring and identity theft insurance for Plaintiff and Class Members, in addition to the two years of monitoring Frontline has offered;

f. An order requiring Frontline to pay the costs involved in notifying Class Members about the judgment and administering the claims process;

g. An award of attorneys' fees, costs, and expenses, including expert witness fees, as allowed by law, including under Rule 23(h) and the common fund doctrine;

h. An award of prejudgment and post-judgment interest as allowed by law;

i. Leave to amend the pleadings to conform to the evidence presented at trial; and

j. An award of such other and further relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury of all claims in this Class Action Complaint so triable.

Dated: October 13, 2026

Respectfully submitted,

*<u>/s/ Andrew W. Ferich</u>*

Andrew W. Ferich
**AHDOOT & WOLFSON, PC**
201 King of Prussia Rd., Suite 650
Radnor, PA 19087
Telephone: (310) 474-9111
Facsimile: (310) 474-8585

M. Anderson Berry (*pro hac vice* forthcoming)
Gregory Haroutunian (*pro hac vice* forthcoming)
Brandon P. Jack (*pro hac vice* forthcoming)
**EMERY REDDY, PC**
600 Stewart Street, Suite 1100
Seattle, Washington 98101
916.823.6955 (Tel)
206.441.8711 (Fax)
anderson@emeryreddy.com
gregory@emeryreddy.com
brandon@emeryreddy.com

Scott Stillman (*pro hac vice* forthcoming)
**THE LAW OFFICE OF SCOTT STILLMAN**
220 Jackson St., Suite 350
San Francisco, CA 94111
Tel: (415) 306-8024
Email: Scott@ScottStillmanLaw.com

*Attorneys for Plaintiff*